**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN M. ORLANDO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 06 C 3758 |
| v. | ) | |
| | ) | Magistrate Judge Susan E. Cox |
| UNITED OF OMAHA LIFE INSURANCE | ) | |
| COMPANY, a Nebraska corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

In 2002, West Monroe Partners, LLC ("West Monroe") hired John Orlando ("plaintiff") to serve as a management executive. West Monroe offered its employees, including plaintiff, long-term disability benefits through a voluntary group insurance policy (the "Policy") issued by United of Omaha Life Insurance Company ("defendant"). In June 2003, plaintiff became disabled and filed a claim for maximum benefits under the policy. There is no dispute that defendant, as the plan administrator, approved and paid plaintiff's disability claim for two years, which was the policy's maximum benefit period. Plaintiff disputes, however, defendant's decision to pay him less than the full amount of benefits. The parties have each filed a motion for summary judgment. Plaintiff asserts that defendant incorrectly determined his monthly earnings, which resulted in an incorrect monthly benefit payment. Defendant's motion, however, argues that plaintiff agreed to accept a reduced salary during his first seven months of employment, which then reduced the amount of disability benefits he was eligible to receive. We grant defendant's motion [dkt. 116] and deny plaintiff's motion [dkt. 114].

# I.    Background[1]

Plaintiff had been a consultant for more than ten years when he left a large consulting firm to  join several former colleagues at West Monroe.[2] His time there was, however, limited. After working there for close to nine months, on June 24, 2003, plaintiff was diagnosed with major depression and panic disorder and quit work.[3] Plaintiff had purchased long-term disability through defendant, paying a $42.50 premium each month (based on monthly earnings of $12,500 per month, or $150,000 "total annual insured payroll").[4] When plaintiff applied for disability coverage, defendant initially denied plaintiff's claim.[5] But, on May 7, 2004, defendant approved his application.[6] According to the Policy, plaintiff was entitled to, and received, the maximum of 24 months of monthly benefits.[7] Those benefits began on September 23, 2004.[8] The precise amount of those monthly benefits is what remains in dispute.

Under the Policy, the monthly benefit that plaintiff was entitled to receive was determined as follows:

> If you are Disabled and earning less than 20% of Your Indexed Pre-Disability Earnings, the Monthly Benefit is the lesser of:
>
> (a)      60% of Your Basic Monthly Earnings;
> (b)      70% of Your Basic Monthly Earnings;
> (c)      $7,500 the Maximum Monthly Benefit.[9]

---

[1]Citations to the record are in the following form: defendant's amended response to plaintiff's Local Rule 56.1 statement is cited as DR ¶ ____; plaintiff's response to defendant's amended Local Rule 56.1 statement is cited as PR ¶ ____ ; defendant's summary judgment appendix is cited as Appendix, Exh __, MO___.

[2]Appendix, Exh C, MO00326-27.

[3]P.R. ¶ 26; *see* Appendix, Exh C, MO00082.

[4]D.R. ¶15.

[5]D.R. ¶9.

[6]D.R. ¶ ¶ 9-10.

[7]P.R. ¶12.

[8]D.R. ¶11.

[9]D.R. ¶13.

The definition of "Basic Monthly Earnings" is required for purposes of determining the monthly benefit. The Policy defines it as:

> **Basic Monthly Earnings** means Your average gross monthly earnings received from the Policyholder during the Calendar Year immediately prior to the year in which Your Disability began, or, if employed less than one year, Your average earnings for the number of months worked.
>
> Basic Monthly Earnings includes employee contributions to Deferred Compensation plans received from the Policyholder. Basic Monthly Earnings does not include commissions, bonuses, overtime pay, Policyholder contributions to a Deferred Compensation plan, shift differential or other extra compensation received from the Policyholder.[10]

Because plaintiff was employed for less than one year, the "average earnings for the number of months worked" was determined.[11] This brings us to plaintiff's compensation. Plaintiff's contract with West Monroe was in the form of a letter, sent in October 2002, which outlined the terms of his employment.[12] The letter provides that he would receive: a target annual "draw" in the amount of $200,000, but the "monthly draw will be 25%, 50%, 75% and 100% of your full monthly 2003 target draw for the months of January, February, March and April," and; 25,000 units of equity ownership in the company.[13] The letter also states that the company "may have to adjust these amounts depending on the circumstances of our actual cash flows."[14] There is no dispute that plaintiff's agreement "called for a 3 month 'ramp up' with no pay," followed by the payment schedule outlined above.[15]

---

[10] Appendix, Exh B, MO00538.
[11] *See* Appendix, Exh B, MO00538.
[12] Appendix, Exh C, MO00176-79.
[13] Appendix, Exh C, MO00176-79.
[14] Appendix, Exh C, MO00176-79.
[15] Appendix, Exh C, MO00325.

Separate from the pay schedule outlined in his October employment letter, beginning on March 16, 2003, plaintiff agreed to reduce his compensation by $25,000 over three months.[16] For this, West Monroe "granted [him] an additional 5,000 fully vested units."[17] There is also no dispute that the payroll records show that West Monroe paid plaintiff $49,669.58 in nine payments between June 20, 2003 and October 22, 2003.[18] But it is here that the parties' views on plaintiff's compensation diverge.

Plaintiff contends that his annual salary equates to a monthly salary of $16,666.67, which is calculated by taking plaintiff's "target annual draw" of $200,000 (provided for in his employment letter) and dividing it by 12 months of pay.[19] Using those numbers, plaintiff calculates that his salary, for the time that he worked for West Monroe, was $149,999.99.[20] He comes to this figure by multiplying his monthly salary of $16,666.67 by nine months.[21] Plaintiff claims those nine months to be October 2003 to June 2003.[22] It should be noted that the parties dispute whether plaintiff started in October or whether he started on November 1, 2002. The record reflects four possible hire dates, October 8, October 12, October 15, and November 1, 2002.[23] For purposes of this analysis, the Court will assume plaintiff started working sometime in October, or, worked for a total of nine months.

When plaintiff left work due to his disability, West Monroe initially considered plaintiff's monthly salary to be $16,666.67, or the equivalent of $200,000 per year for purposes of his eligibility for benefits.[24] But then defendant's Senior Benefit Analyst, Vicki Pruch, consulted John Gagnon from

---

[16] Appendix, Exh. C, MO00390.
[17] P.R. ¶24.
[18] D.R. ¶ 20.
[19] D.R. ¶17.
[20] D.R. ¶18.
[21] D.R. ¶18.
[22] D.R. ¶18.
[23] Appendix, Exh. C, MO00179, MO00332, MO00214, MO00081, MO00147.
[24] P.R. ¶37, ¶39.

John Hewitt & Associates ("JHA"), the underwriting manager for defendant's reinsurer, to see if additional documentation was necessary.[25] Mr. Gagnon advised Ms. Pruch to obtain plaintiff's payroll records.[26] The payroll records reflect that plaintiff only received one paycheck while he was working for West Monroe, dated June 20, 2003, in the amount of $9,166.67.[27] The additional salary that plaintiff received came in the form of eight paychecks that were issued between July 7, 2003 and October 7, 2003, after plaintiff had left the company on disability.[28]

Defendant's reinsurer, JHA, had their certified public accountant, Connie Cardamone, review the records.[29] In Ms. Cardamone's recommendation, she stated that the amount paid to plaintiff "in 2003 was the compensation that he deferred from 2002 and earlier in 2003."[30] This information came from West Monroe's human resources director, Paulette McKissic. A contemporaneous phone log from Ms. McKissic shows that she told Ms. Pruch that the executives donated their time without salary for 3 months, then in January 2003 plaintiff deferred his salary until June 20, 2003.[31] The salary he then received reflected compensation from January 2003 to June 2003.[32] In light of that information, Ms. Cardamone noted that "no Deferred Compensation plan under the Internal Revenue Code was established to allow him to defer his $200,000 salary" and that because the company was a small start-up, it was probable that "he wasn't paid any compensation prior to 6/20/03 because the funds were not available to pay him."[33] Ms. Cardamone next used the payments from 2003 to determine his monthly average income, noting that he received $49,669.58 for his time with the

---

[25]P.R. ¶39.
[26]P.R. ¶40.
[27]Appendix, Exh. C, MO00156; P.R. ¶43.
[28]Appendix, Exh. C, MO00148-57; P.R. ¶43.
[29]P.R. ¶46.
[30]Appendix, Exh. C, MO00218.
[31]Appendix, Exh. C, MO00160.
[32]*Id.*
[33]Appendix, Exh. C, MO00218.

company. She divided that amount by 7 months and 23 days to come up with his average monthly earnings of $6,395.22.[34]

Defendant followed Ms. Cardamone's recommendation, using her calculation of plaintiff's Basic Monthly Earnings, to determine plaintiff's disability benefits. As noted, the Policy provides that,

the Monthly Benefit is the lesser of:

    (a)    60% of Your Basic Monthly Earnings;
    (b)    70% of Your Basic Monthly Earnings;
    (c)    $7,500 the Maximum Monthly Benefit.[35]

Defendant, therefore, took 60 percent of $6,395.22 to find that plaintiff was owed $3,837.13 as a monthly disability benefit.[36] (Because plaintiff also received monthly social security disability benefits of $1,870.00, that amount was subtracted from the $3,837.13).[37]

In August 2004, plaintiff appealed. Both plaintiff, personally, and West Monroe's president, Dean Fischer, wrote letters in support of defendant increasing plaintiff's monthly benefit. Plaintiff directed his letter to Ms. Pruch. His letter outlined his job history and responsibilities, his employment contract with West Monroe, and his request that defendant re-calculate his Basic Monthly Earnings to $10,416.67, based on what he determined his first year earnings to be.[38] Specifically, he claimed that he would have made $125,000 had he worked through the end of the year.[39] Plaintiff also stated "I am conceding that I would not have earned $200,000 in base salary my first year with [West Monroe] even though we purchased this policy with that requirement."[40] But,

---

[34]Appendix, Exh. C, MO00218.
[35]D.R. ¶13.
[36]P.R. ¶50.
[37]P.R. ¶12.
[38]Appendix, Exh. C, MO00324.
[39]*Id.*
[40]*Id.*

he said, he would have earned $125,000 because his contract called for "a 3 month 'ramp up' with no pay followed by 3 more months paying 25%, 50%, and 75% respectively," at which time he was to receive 100% of his monthly pay based on a salary of $200,000 a year.[41] The letter from West Monroe's president, Mr. Fischer, was more concise. It simply stated that had plaintiff worked through December 2003, his earnings for the year "would have totaled approximately $115,000.00."[42]

Still, defendant upheld its determination of plaintiff's Basic Monthly Earnings, noting that the Policy was not "an indemnity contract insuring a specific amount regardless of earnings."[43] So plaintiff retained an attorney. Beginning in February 2005, several letters were exchanged between plaintiff's counsel, West Monroe, and defendant.[44] Through this correspondence, plaintiff's counsel attempted to explain the discrepancy in plaintiff's pay (shown by the payroll records) and his salary (as provided for in the October employment letter from West Monroe).

For example, on February 9, 2005, plaintiff's counsel explained that "between October 2002 and March 2003, [plaintiff] used $75,000 of his $100,000 in earnings to purchase 25,000 units of ownership. Thereafter, [plaintiff] used $25,000 of his earnings to purchase an additional 5,000 units of ownership."[45] Plaintiff's position was, essentially, that he voluntarily used $100,000 of his earnings to purchase equity in West Monroe. Plaintiff claimed, therefore, that he earned and received an additional $100,000 in the form of salary. Then, on August 5, 2005, plaintiff's counsel again wrote to defendants explaining that,

> although Mr. Orlando earned $16,666.67 each month between October 2002 and June 2003 (the date of his disability), for a total of roughly $150,000, he received only about $50,000 in cash because he voluntarily chose to purchase 25,000 units of

---

[41]Appendix, Exh. C, MO00325.
[42]P.R. ¶54; Appendix, Exh. C, MO00321.
[43]Appendix, Exh. C, MO00331.
[44]P.R. ¶ ¶57-63.
[45]P.R. ¶57.

ownership for $75,000 and an additional 5,000 units of ownership for $25,000. As a result, [plaintiff's] Basic Monthly Earnings for the nine months he worked prior to his disability should be based on total earnings during that period of $150,000, not $49,669.58.[46]

The letter goes on to state that,

because you apparently draw a distinction between fully vested units of ownership and units which vest over time, you have effectively conceded that the total earnings upon which [plaintiff's] Basic Monthly Earnings are based should be increased $25,000 because he was fully vested in 5,000 of the 30,000 units of ownership he purchased.

The letter next explains why, under plaintiff's theory, West Monroe determined that plaintiff's salary was only $115,000, not $150,000. Plaintiff's counsel notes that West Monroe apparently assumed that plaintiff "would have purchased additional units of ownership in the second half of 2003 for $35,000."[47] The numbers would then work out to $115,000 for the year because plaintiff would have contributed "$25,000 in the first quarter, $25,000 in the second quarter and $35,000 in the last half of the year to the purchase of units of ownership."[48]

In response, on August 17, 2005, defendant wrote that "no pay records or documentation has been received that contradicts the $49,669.58 reported as earnings paid to [plaintiff] by the policyholder during 2003."[49] Defendant explained that though plaintiff's letters discussed his "proposed salary," without something to show that he actually received additional earnings, it would be "unable to authorize additional benefits."[50]

The final correspondence was written by Mr. Fischer, at West Monroe. In an October 2005 letter, Mr. Fischer wrote that plaintiff's salary was $200,000 a year but, "instead of taking on short-

---

[46]Appendix, Exh. C, MO00412.
[47]Appendix, Exh. C, MO00411.
[48]*Id.*
[49]P.R. ¶ 61.
[50]*Id.*

term debt to meet payroll...the company permitted certain executives to receive additional units of ownership in lieu of cash as payment for services rendered to the company."[51] In plaintiff's case, Mr. Fischer explained, "the company offered 5,000 fully vested units of ownership as a substitute for $25,000 in cash for services actually performed by [plaintiff]."[52] Mr. Fischer went on to note that, had plaintiff rejected the offer, he would have simply been paid an additional $25,000 (in addition to the $49,669.58).[53]

Defendant again responded that it still would need documentation of "earnings received," such as tax records or a copy of a K-1 form.[54] Simply put, defendant stated that it was not enough for Mr. Fischer to say, in a letter, that plaintiff received units of ownership in lieu of $25,000.[55] Without further documentation, it was "unable to consider additional benefits."[56]

## III. Standard of Review

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[57] When there are cross-motions, "our review of the record requires that we construe all inferences in favor of the party against whom the motion under consideration is made."[58] Judge Coar previously ruled in this case that the Policy is governed by the Employee Retirement Income Security Act ("ERISA").[59] So despite plaintiff's request, we will not revisit that issue. We also previously addressed what standard of review to apply to this dispute. The denial of ERISA benefits must be reviewed *de novo,* except when the policy gives the administrator

---

[51]P.R. ¶ 62.
[52]*Id.*
[53]*Id.*
[54]P.R. ¶ 63.
[55]*Id.*
[56]*Id.*
[57]Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).
[58]*Tegtmeier v. Midwest Operating Engineers Pension Trust Fund,* 390 F.3d 1040, 1045 (7th Cir. 2004)(citations omitted).
[59]*Orlando v. United of Omaha Life Ins. Co.,* No. 06 C 3758, 2007 WL 2875241 (N.D. Ill., Sept. 30, 2007).

the authority to determine eligibility for benefits or to construe the terms of the policy and the participants have notice that such power was given.[61] On July 29, 2008, we ruled that plaintiff's claim was to be reviewed under the arbitrary and capricious standard because defendant had provided constructive notice to plaintiff that it was vested with discretionary authority as plan administrator.[62] This "'least demanding form of judicial review'" warrants a denial of benefits to be upheld if there is any reasonable interpretation of the plan.[63] In other words, the fiduciary's denial of benefits may be overturned only when it is "'completely unreasonable'" and it is irrelevant whether or not this court would reach the same conclusion.[64]

## IV. Analysis

Plaintiff challenges the denial of what he deems to be the full amount he is entitled to under the Policy and seeks an additional $117,440.40 of long-term disability benefits. The parties agree that the Policy sets out the parameters for determining the benefit amount and that the amount is based on plaintiff's "average earnings for the number of months worked."[65] The parties disagree, however, on the number of months plaintiff worked at West Monroe and how much he was paid for his time with the company. Specifically, plaintiff argues that he worked for nine months and that defendant failed to consider $100,000 of his earnings. Conversely, defendant determined that plaintiff worked only 7 months and 23 days and, in support of its decision to award plaintiff a monthly benefit based solely on a salary of $49,669.58, defendant argues the following three points: (1) it was reasonable to rely on its expert, Ms. Cardamone; (2) the Policy requires defendant to rely on earnings actually received, not on premiums paid; and (3) plaintiff's argument that part of his salary went to the

---

[61]*Firestone Tire & Rubber Co. v. Brunch*, 489 U.S. 101, 115 (1989).
[62]*Orlando v. United of Omaha Life Ins. Co.,* No. 06 C 3758 (N.D. Ill., July 29, 2008)
[63]*Hess v. Reg-Ellen Machine Tool Corp.,* 423 F.3d 653, 658 (7th Cir. 2005).
[64]*Hess,* 423 F.3d at 658.
[65]Appendix, Exh B, MO00538.

purchase of ownership is suspect because of its timing, there are no records to support it, and the evidence plaintiff does point to is unreliable.

## A.       Reliance on Expert

 First we address defendant's reliance on its expert, Ms. Cardamone. Though plaintiff does not challenge Ms. Cardamone's bias specifically, he does rely on the law applied when there is an alleged conflict of interest, or when an insurer also acts as a claims administrator. "When it is 'possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries.'"[66] If the fiduciary, in fact, seeks expert advice, provided it has "investigated the expert's qualifications, has provided the expert with complete and accurate information, and determined that reliance on the expert's advice is reasonably justified under the circumstances, the fiduciary's decision will be respected, despite the conflict of interest."[67] Still, the existence of potential bias, or a potential conflict of interest, is not enough to alter the application of the deferential review afforded by the arbitrary and capricious standard.[68]

Defendant did, in fact, rely on the advice of Ms. Cardamone, its certified public accountant. As noted, she recommended that the benefits be calculated according to what the payroll records showed plaintiff to have earned, which was a total of $49,669.58 paid out in nine payments. Ms. Cardamone interpreted the Policy to pay benefits based on "gross monthly earnings ***received***," and determined that amount to be $9,166.67, paid while he was still working at West Monroe.[69] This was the pay plaintiff received on June 20, 2003, and was the only check plaintiff received prior to the date

---

[66]*Hightshue v. AIG Life Ins. Co.,* 135 F.3d 1144, 1148 (7th Cir. 1998).
[67]*Hightshue,* 135 F.3d at 1148.
[68]*Jenkins v. Price Waterhouse Long Term Disability Plan,* 564 F.3d 856, 861 (7th Cir. 2009); *see also Dougherty v. Indiana Bell Telephone, Co.,* 440 F.3d 910, 915 (7th Cir. 2006).
[69]Appendix, Exh. C, MO00218 (emphasis in original).

of disability. In her recommendation, Ms. Cardamone also noted that no deferred compensation plan was implemented under the Internal Revenue Code and surmised that because it was a start-up business, plaintiff likely "wasn't paid any compensation prior to 6/20/03 because the funds were not available to pay him."[70] She then found that though the Policy defined "Basic Monthly Earnings" as "earnings received," the calculation used to determine his monthly average income should be the total amount he received from West Monroe (i.e., $49,669.58) "to give the insured the benefit of the doubt."[71]

Plaintiff argues that Ms. Cardamone did not have complete information when she made her recommendation and, thus, her advice was based on speculation. Plaintiff points out Ms. Cardamone's notation, in her financial review papers, that the only information provided with the referral was: (1) payroll printouts from June 20 to October 22, 2003; and (2) pages "2-3 of a compensation explanation."[72] Ms. Cardamone also states that the 2-page document, which she calls a "Deferred contract," is only 2 pages of a multi-page employment offer and that the document "does not indicate a salary of $200,000."[73] Plaintiff believes Ms. Cardamone to be referring to his October 2002 employment letter here, and the fact that she does not have a full copy of the letter, he believes, was a failure to consider a significant piece of evidence. Plaintiff's logic is that Ms. Cardamone did not see his entire employment letter, which then allowed her to ignore $100,000 of his salary. Plaintiff asserts that seeking expert advice can only be evidence of a thorough investigation (which is required to pass the arbitrary and capricious standard when a conflict of interest exists) when the fiduciary has "provided the expert with complete and accurate information."[74] Because she apparently

---

[70]*Id.*
[71]*Id.*
[72]Appendix, Exh. C, MO00219.
[73]Appendix, Exh. C, MO00218.
[74]*See Hightshue,* 135 F.3d at 1148.

lacked a complete set of documents, plaintiff argues that her recommendation, which defendant accepted, was arbitrary and capricious.

Plaintiff relies heavily on *Hess v. Hartford Life & Accident Insurance Company,* to make these arguments.[75] In that case, the insurance policy explicitly based the employee's benefits on compensation. The court ruled that the plan administrator's calculation of benefits was arbitrary and capricious, and based its finding on the administrator's failure to refer to the employee's most recent employment contract, which was "the best evidence of what [her] compensation was."[76] The administrator in *Hess* initially calculated the employee's monthly benefit based on her 1995 employment contract, but that contract had since been superceded by a new, 1996 contract, with a new base salary.[77] Without even reading the new contract, despite receiving a letter explaining the change, the insurer calculated the plaintiff's benefits based on the old contract.[78] The court held that the employment contract was "the most critical evidence of the benefits to which [the employee] was entitled," and noted that the examiner's failure to read the pertinent evidence (i.e., the new contract) did not shield the fiduciary from review.[79]

This case is applicable inasmuch as here, too, the Policy requires defendant to determine plaintiff's earnings. Plaintiff's October employment letter is the only document that specifically discusses plaintiff's salary. It provides that plaintiff's "target annual draw will be in the annualized gross amount of $200,000."[80] Plaintiff argues that applying *Hess*, the most "critical evidence" was plaintiff's employment letter.[81] Ms. Cardamone failing to review a portion of it, plaintiff asserts,

---

[75] 274 F.3d 456, 463 (7th Cir. 2001).
[76] *Hess,* 274 F.3d at 463.
[77] *Id.* at 459-60.
[78] *Id.* at 460.
[79] *Id.* at 462-63.
[80] Appendix, Exh C, MO00179.
[81] *See Hess,* 274 F.3d at 463.

deems defendant's decision arbitrary.

But it is not so simple in this case. First, unlike in *Hess,* the defendant here actually had plaintiff's employment letter in its possession (multiple copies in fact) and there is significant evidence to show that defendant did, in fact, read it. In November 2003 West Monroe faxed a copy of the October employment letter to defendant and in August 2005 plaintiff's counsel again faxed a copy to defendant.[82] Also, in October 2003, defendant received from Ms. McKissic a Long Term Disability Employer's Statement, where she identified plaintiff's salary as $16,666.67, or $200,000.[83] There is evidence that defendant's reinsurer knew that plaintiff's salary was claimed to be $200,000 as well. In November 2003, defendant's Senior Benefit Analyst, Ms. Pruch, emailed JHA noting that "[plaintiff's] current [monthly] salary is $16,666.67."[84] Finally, on August 17, 2005, defendant referred to the October employment letter, and plaintiff's "target draw," in its letter upholding its denial of additional coverage.[85] With all of this in mind, the possibility that Ms. Cardamone did not see plaintiff's entire employment letter is simply not enough to show that defendant's reliance on her opinion was arbitrary and capricious.

Second, the October employment letter is not necessarily the best evidence of plaintiff's earnings. The employment letter provides only that plaintiff's "target" annual draw would be $200,000. It also contains a disclaimer. It states that West Monroe "may have to adjust these amounts depending on the circumstances of our actual cash flows."[86] So though West Monroe was planning to pay plaintiff $200,000, it left room for that number to change. Another distinction is that, here, plaintiff had worked less than a year. The Policy provides that when determining benefits for

---

[82]Appendix, Exh. C, MO0176-79; MO00390-402.
[83]Appendix, Exh. C, MO00084-89.
[84]Appendix, Exh. C, MO00123.
[85]Appendix, Exh. C, MO00421-22.
[86]Appendix, Exh. C, MO00179.

an employee that becomes disabled within less than one year of employment, the "average earnings" are to be calculated. Looking to the payroll records to determine average earnings for a period of less than one year is simply not "downright unreasonable."[87]

## B.   Earnings Received versus Premiums Paid

We next move to defendant's second argument, that the Policy requires it to rely on earnings actually received when determining plaintiff's monthly benefit, not on premiums paid. Basic Monthly Earnings is a defined term in the Policy. It means "Your average gross monthly earnings received from the Policyholder during the Calendar Year immediately prior to the year in which Your Disability began, or, if employed less than one year, Your average earnings for the number of months worked."[88] Defendant's interpretation took the amount of salary that could be traced to payroll records - or plaintiff's salary for the "number of months worked" - and simply divided it by 7 months and 23 days to come up with a monthly average. (We are unclear how defendant came up with 7 months and 23 days, even if defendant believes that plaintiff began working on November 1, 2002. That would still work out to be 8 months and 23 days. Even so, had defendant applied plaintiff's version of the number of months worked - 9 months - his monthly benefit would have been even less). Defendant relies on the Policy language "gross monthly earnings received" to support its position that only the $49,669.58 can be used to calculate the average. In other words, that amount is the only salary plaintiff *received* according to the records produced in this case. So despite plaintiff's earning potential, which may have been closer to $200,000 if he had worked through the end of 2003, defendant argues that it is irrelevant for purposes of calculating his benefits.

---

[87]*See Fischer v. Liberty Life Assur. Co. of Boston,* 576 F.3d 369, 376 (7th Cir. 2009)(noting that under the arbitrary and capricious standard, an administrator's determination will be upheld unless it is "downright unreasonable.").

[88]Appendix, Exh. B, MO00538.

Defendant also argues that plaintiff cannot rely on the fact that he paid premiums based on a higher salary. Defendant concedes that plaintiff paid premiums based on his and West Monroe's expectation that his total earnings in 2003 would equal or exceed $150,000, which is the maximum annual earnings insured for each employee under the Policy. And a benefit based on that amount would be 60 percent of $12,500, or the maximum monthly benefit of $7,500. But, defendant asserts, an expectation of salary is not how benefits are determined. Plaintiff did not complete the full year of work so it is reasonable that he did not make $150,000 or even $200,000. In other words, defendant contends that plaintiff's payment of a higher premium does not override the language of the Policy, which provides that Basic Monthly Earnings must be determined based on his "average earnings for the number of months worked."[89]

Plaintiff's response is that defendant has read into its Policy a restriction that does not exist; the Policy does not limit "earnings" to only those earnings received through payroll as reflected on a W-2 statement. Plaintiff notes that the Policy only excludes "commissions, bonuses, overtime pay, Policyholder contributions to Deferred Compensation plans, shift differential or other extra compensation..." but it does not exclude earnings that, in this case, plaintiff used to purchase ownership in the company (the $100,000).[90] Plaintiff urges the court to follow the basic principle that ERISA plans are to be interpreted "in an ordinary and popular sense as would a person of average intelligence and experience."[91] Under this logic, because the Policy does not say earnings must be received through payroll, plaintiff asserts that it was arbitrary and capricious for defendant to refuse to consider the additional $100,000 he believes he earned. Plaintiff even goes so far as to say that the

---

[89]Appendix, Exh. B, MO00538; *see also Meltzer-Marcus v. Hitachi Consulting,* No. 03C7687, 2005 WL 2420367, *6 (N.D.Ill. Sept. 30, 2005)(finding that the payment of premiums was not dispositive and did not override the policy's requirements).

[90]Appendix, Exh. B, MO00538.

[91]*See Swaback v. Am. Info. Tech. Corp.,* 103 F.3d 535, 541 (7th Cir. 1996).

actual receipt of earnings may be relevant to the determination of Basic Monthly Earnings when an employee has worked an entire calendar year prior to the year in which his disability began, but it is not relevant when the employee, like himself, was employed for less than one year.

The Court agrees that the Policy makes clear that earnings *received* is, indeed, relevant but that the Policy separates the definition into two parts. The first part is for an employee that has worked more than one year, and the language provides for a determination based on "Your average gross monthly earnings received from the Policyholder during the Calendar Year immediately prior to the year in which Your Disability began..."[92] But the next part of the definition begins with "or," and then provides "if employed less than one year, Your average earnings for the number of months worked."[93] There is no specific requirement that earnings must be "received" when an employee has worked less than one year.

Nonetheless, when plan language is open to more than one interpretation, a court "will not find the administrator's decision arbitrary and capricious just because we would have reached a different conclusion or relied upon different authority had we been in the administrator's shoes."[94] Unlike in typical contract cases, where ambiguous terms are construed in favor of an insured, such a rule is not applicable in an ERISA case where the plan explicitly grants the administrator broad discretion.[95] Here, defendant interpreted plaintiff's "average earnings" to be those actually documented through payroll. Under the arbitrary and capricious standard, defendant's interpretation controls as long as it is reasonable. We simply cannot say that defendant's determination that "earnings" means money documented through payroll to be "'downright unreasonable,'" and it

---

[92]Appendix, Exh. B, MO00538.
[93]*Id.*
[94]*Gingold v. Unum Life Ins. Co. of Am.,* 74 Fed. Appx. 660, 662 (7th Cir. 2003).
[95]*Gingold,* 74 Fed. Appx. at 662.

certainly does not defy common sense.[96]

With regard to the premiums paid, we are guided by *Gingold v. Unum Life Insurance Company of America*.[97] That case also involved an ERISA plan where the employee paid premiums on a salary of $115,000.[98] That amount was comprised of his base salary plus additional rental income.[99] But the insurer only approved his claim based on $84,000, which was his base salary.[100] Like here, the insurer also sent the claim to a certified public accountant. Based on the CPA's findings, the insurer concluded that, pursuant to the policy, benefits were determined based on "monthly earnings" and that term did not include rental payments.[101] In the end, the court ruled that no matter what amount the employee paid in premiums, "the policy did not promise him a fixed amount of benefits."[102] The court went on to explain that "it is not uncommon for an employee's earnings to change between the time he applies for coverage and the time he submits a claim for benefits."[103] So a certain premium payment, in short, will not act as a guarantee that the employee will receive a particular amount of benefits in the event that the employee becomes disabled.[104]

## C.     Additional Salary

We finally turn to plaintiff's explanation for his missing salary: that he used $100,000 to purchase units of ownership in West Monroe. Defendant claims this is a concocted theory designed to inflate plaintiff's monthly earnings, and argues that it is suspect because of its timing, there are no records to support it, and claims that the evidence plaintiff does point to is unreliable.

---

[96] *Id.*
[97] 74 Fed. Appx. 660.
[98] *Id.* at 661-62.
[99] *Id.*
[100] *Id.*
[101] *Id.* at 662.
[102] *Id.* at 664.
[103] *Id.*
[104] *Id.*

First, we address the timing of plaintiff's explanation. It is true that plaintiff did not make this precise argument (that he purchased equity) until his lawyer became involved in the case. In fact, when plaintiff wrote his appeal letter to defendant, in August 2004, he did not mention that he had received an additional $100,000 that he used to purchase ownership in the company. Rather, the only specifics he provided, with respect to his salary, were the following:

> My specific contract called for a 3 month "ramp up" with no pay followed by 3 more months paying 25%, 50%, and 75% respectively at which point I would receive 100% of my monthly pay based on a salary of $200,000 a year.[105]

Then he states that this would constitute "$125,000 in pay for the first 12 months of employment."[106] So back then, he was not even attempting to receive benefits based on $150,000, which is what he is asking for now in his motion. The much more detailed explanation of how his salary was used to purchase equity was only first outlined in February 2005, when his attorney became involved for purposes of appeal.

To recap, plaintiff now asserts that he paid for units of ownership by contributing back to the company: all of his October through December 2002 earnings, 75 percent of his January 2003 earnings, 50 percent of his February 2003 earnings, and 25 percent of his March 2003 earnings. According to plaintiff, that works out to be $50,000 between October and December 2002, $12,500 in January 2003, $8,333.34 in February 2003, and $4,166.67 in March 2003 that he used to purchase ownership in West Monroe, which equals $75,000. Then, to explain the remaining $25,000, plaintiff asserts that he voluntarily contributed that amount - his salary for March, April, and May 2003 - for an additional 5,000 units of ownership. All of this, in total, constitutes a purchase of 30,000 units of ownership.

---

[105]Appendix, Exh. C, MO00325.
[106]*Id.*

But regardless of the timing of plaintiff's explanation, defendant was still willing to credit plaintiff's explanation had there been records to support it. These records, however, do not exist. If plaintiff did, in fact, spend $100,000 of his work earnings to purchase equity shares in West Monroe, there should be tax records, an IRS K-1 schedule, or something formalizing the transaction. There is simply nothing in this record to support plaintiff's contention.

Even now, plaintiff does not point to evidence that he owns those 30,000 units of West Monroe. The only contemporaneous evidence in the record to support an exchange of salary for units of ownership is the April 2003 letter from West Monroe, where West Monroe indicated that it "granted [plaintiff] an additional 5,000 fully vested units" as a "gesture of appreciation" for reducing his compensation for three months.[107] Aside from this letter, there is nothing to show that, at the time, he paid for any units of ownership. And plaintiff does not seem to dispute this lack of evidence. He simply argues the negative: there is no evidence that he agreed to accept a reduced salary during his first seven months of employment in exchange for *nothing*.

This brings us to defendant's argument that the evidence plaintiff does rely on does not support that he purchased equity. Or, the assertion that the evidence is, simply, unreliable. First, plaintiff refers to his October 2002 employment offer letter. He believes this letter supports the contention that he paid for the first 25,000 units of ownership out of his salary. The employment letter provides that his target annual draw would be $200,000 and that, "[u]pon acceptance of our offer," plaintiff "will be granted 25,000 units of ownership."[108] Plaintiff contends that this language supports his decision to reduce his salary between October 2002 and April 2003, because he received equity in return. The problem is, the October employment letter does not say anything about using his

---

[107] Appendix, Exh. C, MO00390.
[108] Appendix, Exh. C, MO00178.

monthly salary as payment for those units of ownership. In fact, plaintiff says as much in his response

to defendant's motion, when he asserts that nothing in the employment offer letter required him to

pay, upfront, for the 25,000 units.[109] So plaintiff's argument is that, somehow, it is obvious that he

paid for the 25,000 units of ownership by purchasing them with $75,000 of salary that he otherwise

would have received between October 2002 and April 2003. The employment letter by itself,

however, does not provide detail anywhere near that specific.

 Plaintiff also breaks down his purchase of units of ownership for the period October 2002 to

April 2003. He makes the curious argument that he used his full salary between October and

December 2002 to purchase equity. The months thereafter he only used a certain percentage of his

full draw. But it is documented both in his October employment letter and in his August 2004 appeal

letter that plaintiff would not begin to receive compensation until January 2003. So it is unclear how

it is that he used his full draw, or $50,000, between October and December 2002 to purchase equity.

 Plaintiff additionally relies on another letter from Mr. Fischer, this one written in August

2004. In this letter Mr. Fischer states that had plaintiff worked through December 2003, "his earnings

for the year would have totaled approximately $115,000.00."[110] Plaintiff argues that, at the very least,

defendant could have relied on this statement and awarded him $4,838.33 per month in benefits

($115,000 divided by 12 months equals $9,583.33, and 70 percent of that amount is $6,708.33 less

social security benefits of $1,870). Again, even West Monroe does not support plaintiff's current

argument that his benefits should be based on $150,000.00.

 Then plaintiff refers to Mr. Fischer's September 20, 2005 letter, written for purposes of

plaintiff's appeal, where Mr. Fischer explains that plaintiff possessed "25,000 units of unvested

---

[109]Pl's response to def.'s MSJ at 5.
[110]Appendix, Exh. C, MO00321.

ownership" and that his salary was $200,000 a year. The letter further states that in plaintiff's case, West Monroe offered him "5,000 fully vested units of ownership as a substitute for $25,000 in cash for services actually performed..."[111] This information corroborates his earlier letter, noted above, where he indicated that West Monroe awarded plaintiff 5,000 fully vested units of ownership. Except in this most recent letter, rather than stating that the 5,000 units was "a gesture of appreciation," as he did back in April 2003, Mr. Fischer states that it was a substitute for $25,000 in cash.

With this somewhat confusing mix of information, defendant reiterates its reliance on the evidence from Ms. McKissic, West Monroe's human resources director: (1) that plaintiff agreed to defer payment of his salary to June of 2003; and (2) that he "donated" his time from October to December 2002, which plaintiff then said himself in his appeal letter to defendant.[112] With this evidence, plus the payroll records that show plaintiff receiving only $49,669.58, defendant argues that its determination of benefits, based solely on a salary actually supported by payroll records, is not unreasonable. We cannot disagree. Defendant offered a "reasoned explanation, based on the evidence, plan documents, and relevant factors" in the record.[113] There is documentation that plaintiff was willing to work for West Monroe, in its initial phases, for a reduced salary. He started work and for the first 3 months, accepted no salary at all.[114] Then his October employment letter detailed how his salary would incrementally increase until the Spring of 2003 when he would receive - depending on the circumstances of West Monroe's cash flow - his full draw.[115] But March 2003 came, and plaintiff again "voluntarily reduce[d]" his compensation for three months, though he did receive

---

[111]Appendix, Exh. C, MO00416.
[112]Appendix, Exh. C, MO00158-60.
[113]*See Fischer,* 576 F.3d at 376.
[114]Appendix, Exh. C, MO00325.
[115]Appendix, Exh. C, MO00179.

equity in return.[116]

 There is no concrete support for plaintiff's explanation that he earned an additional $100,000. Even through the appeal process, and despite defendant's requests, plaintiff could not offer evidence of the additional $100,000. Plaintiff's strongest support - his October employment letter - is not conclusive on that point. That letter explicitly left room for West Monroe to modify plaintiff's salary. So although the result is unfortunate for plaintiff, defendant's decision to grant him a significantly reduced monthly benefit finds rational support in the record. Defendant's disability determination is not, therefore, arbitrary and capricious.

---

[116]Appendix, Exh. C, MO00390.

**V.       Conclusion**

Plaintiff's motion for summary judgment is denied [dkt 114] and defendant's motion for

summary judgment is granted [dkt 116].

**IT IS SO ORDERED.**


**ENTERED:** <u>September 30, 2009</u>                    _____

                                                              **UNITED STATES MAGISTRATE JUDGE**
                                                              **Susan E. Cox**